IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

DEBBIE J. SIMPSON,   )
                     )
    Plaintiff,       )
                     )
    -vs-             )
                     )  Civil Action No. 07-442
                     )
TWIN RIVERS TOWING COMPANY and )
CONSOLIDATION COAL COMPANY, as owners )
or owners pro hac vice, or Charterer of the Motor )
Vessel John L Rozance, )
                     )
    Defendants.      )

AMBROSE, Chief District Judge.

**FINDINGS OF FACT**
**CONCLUSIONS OF LAW**
**AND**
**ORDER OF COURT**

**I.    INTRODUCTION**

This is a maritime personal injury action brought by Deborah Simpson pursuant to the Jones Act, 46 U.S.C. §§30104, 30105, and 30106, and general maritime law. (Docket No. 1). The Complaint alleges that Plaintiff, Deborah Simpson, was injured on May 31, 2005, while working for Defendant, Twin Rivers Towing Company ("Twin Rivers") as a cook, on the Motor Vessel ("M/V") John L. Rozance. *Id.* The Complaint further alleges that when the M/V Rozance entered the lock, the crew did not adequately engage the warning system to alert those on board to possible danger. Because there was no warning when the boat entered the bump, Plaintiff claims, Defendants breached their duty owed to her, which created an unseaworthy ship and led to her subsequent injury.

This Court has subject matter jurisdiction pursuant to the Court's federal admiralty and maritime jurisdiction granted by 28 U.S.C. § 1333(1). *See,* Fed.R.Civ.P. 9(h).

A non-jury trial was commenced on March 14, 2008, continued on April 15, 2008, and concluded on April 23, 2008. At the conclusion of the trial, I directed the parties to submit proposed Findings of Fact and Conclusions of Law on the issues of liability and damages. On September 9, 2008, the record was reopened. (Docket No. 85). Additional testimony was taken on September 29, 2008. At trial, Plaintiff offered her own testimony, testimony of maritime expert David Cole, Plaintiff's physician, Dr. Lee, and economic expert, Donal Kirwan. Defendants presented testimony from Linda Burstynowicz, M.D., Dr. Robert Smith, Dr. William Abraham, Michael Somales, William Butler, Joseph Eckstein, Brett Smith, Charles Santi, Douglas Halsey, Jamie Lazar, and James Pasinski. Having now fully considered the testimony of all witnesses and evidence, as well as the submissions of the parties, I make the following Findings of Fact and Conclusions of Law pursuant to Rule 52 of the Federal Rules of Civil Procedure.

## II. FINDINGS OF FACT

### A. Liability

1. As set forth more fully below, I find, based on the testimony and evidence presented at trial, that Plaintiff, Debbie J. Simpson, is not credible based on the inconsistencies of her own testimony, the contradictory evidence from other witnesses and evidence, the lapses in seeking and continuing medical treatment, and the altering of a doctor's work excuse which calls into question her trustworthiness. Therefore, I find her entire testimony is unreliable and do not give it much weight.

2. Plaintiff, Debbie J. Simpson, is an adult individual who resides in Grindstone, Fayette County, Pennsylvania.

3. In March of 2003, Plaintiff was employed by Defendant, Twin Rivers Towing Company ("Twin Rivers"), as a cook on motor vessels typically working seven days on and seven

days off for an average total of fourteen work days a month.

4. The motor vessels and their crews transport barges to various locations along the Monongahela, the Allegheny and the Ohio rivers.

5. A typical motor vessel crew consists of seven employees: four deckhands, a captain, a pilot, and the cook. During the "front watch" the vessel is operated by the captain and two deckhands. During the "after watch" the vessel is operated by the pilot and the two other deckhands.

6. The duties of a cook include making the meals, cleaning up the galley, setting the table, and washing the dishes.

7. Michael Somales was the Port Captain for Twin Rivers during the time in question and handled personnel issues and the staffing of vessels.

8. Mr. Somales testified that during the last seventeen months of Plaintiff's employment with Twin Rivers she had an attendance issue. From January of 2004 through May of 2005 Plaintiff averaged only 7.3 days of work per month. While Mr. Somales testified that he had conversations with Plaintiff about the same wherein he warned her that continued absences could result in discipline, including termination, Plaintiff denies ever having such conversations.

9. Plaintiff's typical "change day" was Thursday. Plaintiff was scheduled to work on M/V Rozance beginning on Thursday, May 26, 2005.

10. At trial, Plaintiff testified that she called off work on the morning of May 26, 2005, because she tripped on steps at home; however, she testified during her deposition that she did not report to work because work called and told her they did not have a boat for her so she was on standby.

11. On May 26, 2005, Plaintiff went to the Brownsville Hospital Emergency Room. The records from the hospital indicate that Plaintiff injured her jaw, her left elbow, and her left knee.

12. Plaintiff reported to work on May 31, 2005.

13. From May 26, 2005, until May 31, 2005, the M/V Rozance was operating without a cook. The cooking duties were performed by the deckhands Charles Santi and Ed Sloan.

14. When Plaintiff was told that she was going to be placed on the M/V Rozance, she informed Mr. Somales that she did not get along with the Captain, William Butler.

15. At that time, Mr. Somales asked Plaintiff for a copy of her doctor's excuse for failing to report for work on May 26, 2005. Plaintiff indicated that the excuse was in her car, but then proceeded directly to the M/V Rozance and did not produce an excuse to Mr. Somales.

16. Plaintiff boarded the M/V Rozance around 8:30 a.m. in West Elizabeth, Pennsylvania.

17. At the time Plaintiff boarded the vessel, it was a "light boat," meaning it had no barges in tow.

18. When Plaintiff boarded the M/V Rozance around 8:30 a.m., the vessel was being operated by the "front watch" consisting of Captain William Butler and deckhands Charlie Santi and Ed Sloan.

19. Mr. Santi had already begun to prepare lunch. He started a salad, bean soup, peeled potatoes and thawed chicken.

20. When Plaintiff saw Mr. Santi in the galley, Plaintiff told Mr. Santi that she fell at home and injured her jaw. Mr. Santi saw that her face was swollen and black and blue. Plaintiff informed Mr. Santi that she should not be at work.

21. Plaintiff started to finish cooking some of the food, set the table for lunch, and began to clean up from breakfast. Plaintiff also began to wash the dishes.

22. At that time, the Captain was making his approach to Lock No. 3, proceeding at a walk pace.

23. While navigating through Lock No. 3, the M/V Rozance merely rubbed/brushed the lock wall. The rub was not hard or noticeable. In fact, Mr. Santi testified that he was on the

head of the boat getting a line ready to pull down the lock wall and standing free with lock line in his hand. He watched as the vessel rubbed the lock wall. He testified that if it had been a hard hit, he would have seen it coming and would have been knocked off his feet.

24. In addition, if it were going to be a hard hit, then Captain Butler testified that he would have used the panic button to warn those in the galley of the impending hit, but there was no need to use the panic button because there was no hard hit.

25. The panic button is tested once a week.

26. According to Plaintiff, however, she was washing the dishes when all of the sudden she felt a hard bump. At first, she testified that soapy, bleachy water came out of the sink and hit her in the eyes causing her to stumble backwards into a pantry door and slide to the ground. On cross-examination, Plaintiff testified that it was the hard bump that caused her to stumble backwards and not the soapy, bleachy water. Plaintiff's testimony was the only evidence that there was a hard bump.

27. There was no testimony or evidence that either the pot of soup on the stove or the potatoes in water on the counter fell over or even splashed as a result of the vessel contact with the lock wall.

28. At the time, the deckhand, Brett Smith, was sleeping in a chair with his head in one hand in the lounge. I note that there was no testimony that Mr. Smith's head was knocked from his hand when the vessel rubbed the lock wall.

29. Plaintiff woke Mr. Smith and asked him if he felt the bump. Mr. Smith did not feel the bump.

30. While Plaintiff testified that she told Mr. Smith that she fell in the galley and asked him to call for the Captain, according to Mr. Smith, Plaintiff never told him that she fell in the galley.

31. According to Plaintiff, because the Captain never came downstairs, she went upstairs to report her injury to him, but he refused to fill out an accident report. She then testified that she told the Captain that she was going to call Mr. Somales and report the accident to him.

She further testified that she called both Mr. Somales and Mr. Hughes, a manager, and left messages reporting the injury. However, there is no evidence to corroborate Plaintiff's version of the facts.

32. According to Captain Butler, after he finished his watch, he went downstairs to get lunch. Upon entry into the galley, he noticed that the only food Plaintiff had prepared was a "wad" of frozen fish. The soup was done, but the potatoes were not even cooked.

33. Captain Butler was not pleased with this and spoke to Plaintiff about it. Plaintiff responded by informing Captain Butler that she did not have time to prepare the food. Captain Butler explained that her reason was unacceptable because she got on the boat at 8:30 that morning and had plenty of time. Plaintiff replied that if he did not like it he could call Mr. Somales.

34. Captain Butler called Mr. Somales and Mr. Somales told him to document what had happened.

35. Plaintiff then called Mr. Somales herself to discuss the situation with Captain Butler, but at no time during the conversation with Mr. Somales did Plaintiff mention an injury or an accident in the galley.

36. Captain Butler created a discipline report for Plaintiff's insolent behavior. He presented Plaintiff with the discipline report and she refused to read or sign it.

37. At no time during Captain Butler's exchange with Plaintiff did she mention an injury or an accident. She did not ask Captain Butler to fill out an accident report.

38. Later, while Captain Butler was eating a bowl of soup, Plaintiff informed him that she should not even be on the vessel because she was sick and sore from falling down the steps at her new home, but that she came because she was afraid of being fired. Again, there was no mention of an accident or injury in the galley from a hard bump.

39. Thereafter, Captain Butler went to sleep.

40. That afternoon, another deckhand, Rob Cain, reported to the Pilot, Joseph Eckstein, that Plaintiff wanted to get off the boat because she was feeling dizzy. The Pilot told Mr. Cain to go and confirm that Plaintiff wanted to get off the vessel before he called Mr. Somales. Mr. Cain came back up and informed the Pilot that Plaintiff had changed her mind and did not want to get off. Fifteen minutes later, Mr. Cain informed the Pilot that she now wanted to go home. So, the Pilot went to the galley to ask Plaintiff for himself.

41. Plaintiff told the Pilot that she wanted to get off. The Pilot called Mr. Somales and told him she wanted to get off. Then he handed the phone to Plaintiff to talk to Mr. Somales.

42. Plaintiff told Mr. Somales she was getting off the vessel because she felt dizzy and that her jaw was hurting her, but she did not mention an accident or injury in the galley from a hard bump or that the Captain had not filled out an accident report.

43. The Pilot went off watch and told Captain Butler that Plaintiff was getting off because she was dizzy.

44. Before Plaintiff departed the vessel at Lock No. 4, Captain Butler went to the galley and asked Plaintiff if she was leaving because of their disagreement. She told him that she was leaving because her jaw hurt and she was dizzy.

45. Captain Butler instructed Mr. Smith to help Plaintiff with her bags and television as she departed the vessel, but Plaintiff refused the help. During her departure she jumped down three feet to the landing without difficulty.

46. Plaintiff did not go to her doctor or the emergency room for treatment on the day of the alleged accident.

47. Plaintiff first reported the alleged accident on June 1, 2005.

48. Plaintiff left a voicemail for Michael Hughes indicating that she injured her back while working in the galley the evening before when the Captain hit the lock wall and that the Captain refused to fill out an accident report.

49. Plaintiff left also voicemail with David Podurgiel, a shipper for Defendant, on June 1, 2005, at 9:15 a.m. Her message to Mr. Podurgiel, however, was questioning whether he had received an accident report from the M/V Rozance about her falling in the galley. Mr. Podurgiel advised her that it would be best to talk to Mr. Somales and that he would call her back in five minutes.

50. Plaintiff also called Mr. Somales on his cell phone on June 1, 2005. She asked him if he got her accident report that she filled out the day before even though she had indicated that she did not fill out an accident report. Mr. Somales did not get an accident report and did not know what she was talking about.

51. Mr. Somales called Mr. Butler to find out what Plaintiff was talking about, but Mr. Butler did not know what she was talking about.

52. Plaintiff sought medical treatment for the first time on June 1, 2005. She went to the Brownsville Hospital emergency room where she was treated by Dr. Robert Smith. She was diagnosed with a "back strain" and a urinary tract infection.

53. Dr. Smith gave Plaintiff an excuse to be off work for two days and advised Plaintiff to follow-up with her family physician, Dr. Linda Burstynowitz, in two to three days.

54. Plaintiff called Betty Meiser, a senior analyst for Defendant, to report that the doctor had told her to be off work for two to three days. When pressed by Ms. Meiser, Plaintiff told her that the note said two days, but that two days later would be Saturday and because crew changes were not done on Saturdays, she would probably come out on Monday. Ms. Meiser told her that she was not sure if crew changes were done on Saturday and told her to call Mr. Somales.

55. Plaintiff did not follow-up with Dr. Burstynowitz as advised to do from Dr. Smith. In fact, there are no medical records from Dr. Burstynowitz's office after January 20, 2005. There are medical records, however, from 2004, when Plaintiff was treated for low back pain.

56. On June 3, 2005, Dr. Burstynowitz's office sent Plaintiff a letter informing her that Dr. Burstynowitz would no longer be treating Plaintiff due to an alteration of a work excuse. Plaintiff never called Dr. Burstynowitz's office to dispute the letter accusing her of altering a work excuse.

57. Plaintiff did not return to work for her next scheduled day of June 9, 2005.

58. After failing to return to work and failing to call Mr. Somales, Plaintiff was terminated on June 20, 2005.

59. Plaintiff did not seek any further treatment for her back until eight weeks later when she went to Dr. Yong Cho.

60. The MRI Dr. Cho ordered of Plaintiff came back normal and he referred her to Dr. John K-S Lee, for pain management.

61. Dr. Lee has treated Plaintiff twelve times between August 2005 and November of 2007. With the exception of one visit, Plaintiff rated her back pain as at least an eight on a scale of one to ten.

62. Dr. Lee prescribed physical therapy as a part of Plaintiff's treatment in August of 2005. According to Plaintiff, however, she only attended "one or two" sessions.

63. Dr. Lee testified that Plaintiff was incapable of sustaining employment other than on a sedentary basis.

64. Plaintiff testified that she can no longer perform all of the activities at home she used to do such as yard work, painting, taking care of the dogs, shoveling snow, driving when it rains or when she is on her medication.

65. In the summer of 2007, Plaintiff sustained serious injuries to three of her toes due to an accident she had while operating a lawn mower.

66. According to Plaintiff, she still has symptoms of back pain that disrupt her sleeping, her ability to sit and stand, and her ability to drive (due to the pain medications), yet Jamie

Lazar, the niece of a man who leased a residence to Plaintiff's daughter, testified that in April of 2008, before Plaintiff's daughter moved in, a lot of work had to be done in the house and Plaintiff and Plaintiff's daughter offered to help get the house ready. Plaintiff's daughter was pregnant at the time, however, so Plaintiff did most of the lifting.

67. Ms. Lazar testified that Plaintiff was a very hard worker. The basement contained 300-400 boxes and Plaintiff unloaded one half of the boxes in the basement in one night. The boxes in the basement that were unloaded contained items such as old appliances, papers, weights, magazines, and papers.

68. Ms. Lazar also personally observed Plaintiff install a light by ladder, sand blast walls, paint, clean the kitchen, and clean a window all without physical difficulty and without complaints of pain.

69. She also observed Plaintiff carry the lower end of a sofa up the stairs, out of the basement, and out the door, as well as strapping a refrigerator onto a dolly and carrying it up the basement steps and out the door.

70. Ms. Lazar testified that she liked Plaintiff's work ethic and offered her a job in her cleaning service business that she ran. Ms. Lazar testified that Plaintiff responded by stating that she could not take the job unless it was under the table because she had a workers compensation claim for a broken foot and that she was about to get a settlement of $330,000.00.

71. When asked how Plaintiff could do that, Plaintiff responded that she had gotten away with it for three years and had not been caught yet.

72. Ms. Lazar was upset about the illegitimate claim Plaintiff was making because she is a business owner, so she contacted Mr. Somales.

73. After Plaintiff learned that Ms. Lazar was going to be testifying in the case, Ms. Lazar testified that Plaintiff called her and threatened to kill her and burn down the residence if

she testified.

74. Plaintiff's liability expert was David Cole.

75. Mr. Cole testified that if the events occurred as Plaintiff testified, then he concludes that the vessel hit the wall with "excessive force." He also testified that if the vessel was going to hit with excessive force, Captain Butler should have warned the crew and any passengers by sounding the buzzer. Since there was no warning buzzer activated on May 31, 2005, Mr. Cole concluded that Defendants breached their duty.

76. Since I find Plaintiff's version of the facts to be untrustworthy, I accord little weight to Mr. Cole's testimony that is based upon Plaintiff's version of the facts.

77. Mr. Cole also testified, however, that vessel contact or minor "bumps" are common and expected by the crew, and those types of contact do not require any special precautions to be taken.

78. Plaintiff's economic expert was Donal Kirwan.

79. Mr. Kirwan concluded that Plaintiff's range of future income loss would be between $157,865 (if she were able to return to work) and $225,456 (if she is only able to return part time).

80. Even though her doctor has not seen signs of improvement, according to Plaintiff, as of August 2007, she felt she was able to return to work at least half the time.

81. Defendants' liability expert was Douglas Halsey.

82. Mr. Halsey testified that brushing the lock is something every boat does every time it goes through a lock. According to Mr. Halsey, insignificant bumps, rubbing, or sideswipes are not something about which the crew needs to be warned. When the bump is significant, a warning is necessary because it will knock the crew off their feet.

83. Based on his review of the evidence, Mr. Halsey testified that there was nothing improper about how the M/V Rozance was navigated through the lock by Captain Butler on May 31,

2005. There was nothing out of the ordinary, there was no significant bump and, thus, there was no need to use the buzzer or any other warning devise. According to Mr. Halsey, all of the maneuvers were ordinary and satisfactory.

84. I find the testimony of Mr. Halsey to be credible.

85. Defendants also offered the testimony of Dr. William Abraham.

86. Based on his review of the evidence, Dr. Abraham noted that one year prior to the accident Plaintiff had low back sprain/pain. Plaintiff did not have any fractures or dislocations. Plaintiff did not seek emergency treatment on May 31, 2005. She went to the emergency room on June 1, 2005, and was diagnosed with a soft tissue injury. It was not until six weeks later that she saw a doctor who took x-rays, which were normal. Plaintiff's MRI was normal.

87. He testified that soft tissue injuries resolve in approximately six weeks.

88. Dr. Abraham concluded that there was no objective basis for Plaintiff's continued complaints of pain some two and one-half years later.

89. I find the testimony of Dr. Abraham to be credible.

### III. CONCLUSIONS OF LAW

1. To recover under the Jones Act, a plaintiff has the burden to prove, by a preponderance of the evidence those elements of negligence: duty, breach, notice and causation. *Fasold v. Delaware River & Bay Authority,* 117 Fed.Appx. 836, 838, 2004 WL 2943974, 1 (3d Cir. 2004).

2. "[N]egligence requires the defendant to guard against those risks or dangers of which it knew, or by the exercise of due care, should have known.... [T]he defendant's duty is measured by what a reasonably prudent person would anticipate or foresee resulting from particular circumstances." *Wilburn v. Maritrans GP Inc.,* 139 F.3d 350, 357 (3d Cir. 1998),

*quoting Rogers v. Missouri Pacific R.R. Co.*, 352 U.S. 500, 506 (1957).

3. The "standard of proof for causation when asserting negligence under the Jones Act is relaxed, sometimes termed 'featherweight.' (citation omitted). 'Causation is satisfied if 'the proofs justify with reason the conclusion that employer negligence played any part, even the slightest, in producing the injury.'" *Id. citing, Wilburn v. Maritrans GP, Inc.*, 139 F.3d 350 (3d Cir.1998), *quoting Rogers v. Missouri Pacific R.R. Co.*, 352 U.S. 500, 506 (1957).

4. As set forth above, I find there was no evidence of excessive contact with the lock wall on May 31, 2005, and that no warning was required. Therefore, I conclude that Plaintiff has failed to establish that Defendants breached their duty to Plaintiff.

5. As a result, I conclude that Plaintiff is not entitled to any recovery under the Jones Act.

6. To establish a case of unseaworthiness, Plaintiff must prove by a preponderance of the evidence that the vessel was unseaworthy. *Eddy v. Mon River Towing, Inc.*, Civil Action No. 02-1537, 2004 WL 2984355, *3 (W.D.Pa. June 7, 2004), *citing, Loehr v. Offshore Logistics*, Inc., 691 F.2d 758, 762 (5th Cir. 1982).

7. To be seaworthy, all of the things about a vessel must be reasonably fit for the purpose for which they are to be used. *Eddy v. Mon River Towing, Inc.*, Civil Action No. 02-1537, 2004 WL 2984355, *3 (W.D.Pa. June 7, 2004), *citing, Gutierrez v. Waterman Steamship Corp.*, 373 U.S. 206, 213 (1963), *rehearing denied*, 374 U.S. 858 (1963).

8. The mere fact that an injury has occurred does not establish that the vessel was unseaworthy. *Id, citing, Mosley v. Cia. Mar. Adra, S.A.*, 314 F.2d 223, 228-29 (2d Cir. 1963), *cert. denied*, 375 U.S. 835 (1963).

9. Plaintiff adduced no evidence at trial that the buzzer system on the M/V Rozance was not operational or functional.

10. Moreover, I find that there was no need to use the buzzer while navigating through Lock No. 3 on May 31, 2005, aboard the M/V Rozance, because the contact with the lock wall was

the standard and necessary amount of rubbing contact.

11. Thus, I conclude that the crew was not unfit and the Captain's failure to warn of the standard and necessary contact with the lock wall did not render the vessel unseaworthy.

12. Therefore, I conclude that Plaintiff is not entitled to any recovery under general maritime law for unseaworthiness.

13. Since Plaintiff has failed to meet her burden under both the Jones Act and general maritime law for unseaworthiness, I need not reach any conclusions regarding her alleged injury and her claim for damages.

14. Accordingly, I conclude that Plaintiff is not entitled to any recovery either under the Jones Act or the general maritime law as she has failed to demonstrate by a preponderance of the evidence actionable negligence or an unseaworthy condition of the M/V Rozance.

**********************

Date Filed:    October 20, 2008

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

DEBBIE J. SIMPSON,           )
                             )
    Plaintiff,           )
                             )
-vs-                         )
                             )  Civil Action No. 07-442
                             )
TWIN RIVERS TOWING COMPANY and )
CONSOLIDATION COAL COMPANY, as owners )
or owners pro hac vice, or Charterer of the Motor )
Vessel John L Rozance,       )
                             )
    Defendants.          )

AMBROSE, Chief District Judge.

## ORDER OF COURT

And now this 20th day of October, 2008, it is ordered that the verdict is in favor of Defendants and against Plaintiff.

BY THE COURT:

/s/ Donetta W. Ambrose
Donetta W. Ambrose
Chief U.S. District Judge